

**IT IS ORDERED as set forth below:**

**Date: September 20, 2021**

_____

**Paul Baisier**
**U.S. Bankruptcy Court Judge**

_____

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**NEWNAN DIVISION**

| | |
|---|---|
| In re: | : |
| | :     CASE NO. **20-10925-PMB** |
| **CHAUNCEY DAMON HILL**, | : |
| | :     CHAPTER 7 |
| Debtor. | : |
| ———————————————— | : |
| | : |
| **JOHN W. PUCCI, SR. d/b/a** | : |
| **Chestnut Run Excavating & Tree Service,** | : |
| | : |
| Plaintiff, | : |
| | :     ADVERSARY PROCEEDING |
| v. | : |
| | :     NO. **20-1031** |
| **CHAUNCEY DAMON HILL,** | : |
| **H&H DEMOLITION & HAULING, INC.,** | : |
| **EAGLE DEMOLITION** | : |
| **& ENVIRONMENTAL, INC.,** | : |
| **And VETIA HOLLAND**, | : |
| | : |
| Defendants. | : |
| ———————————————— | : |

**ORDER GRANTING JUDGMENT**
**TO THE DEBTOR ON COUNT I OF PLAINTIFF'S COMPLAINT**

The Plaintiff named above, John W. Pucci, Sr. d/b/a Chestnut Run Excavating & Tree Service (the "Plaintiff" or "Chestnut Run"), initiated this Adversary Proceeding (the "Adversary Proceeding") through the filing of an eight-count complaint titled *John W. Pucci, Sr.'s Complaint Objecting to Discharge of Debts and Adversary Proceeding for Damages and for Equitable Relief* on September 15, 2020 (Docket No. 1)(the "Complaint") against Chauncey Damon Hill (the "Debtor")[1] and the other the Co-Defendants named above.   In Count I of the Complaint, the Plaintiff seeks a determination that an indebtedness owed by the Debtor to the Plaintiff (the "Indebtedness")[2] should be excepted from discharge under 11 U.S.C. § 523(a)(2)(A).[3]

---

[1]  The Debtor filed the underlying bankruptcy case (the "Main Case") under Chapter 7 of title 11, United States Code, on June 17, 2020.   (Main Case Docket No. 1)(the "Petition Date").   The Main Case and the Adversary Proceeding were transferred from Judge W. Homer Drake, Jr. to Judge Paul M. Baisier on February 1, 2021.   *See* Main Case Docket No. 51 and Adversary Docket No. 13.

[2]  On February 2, 2018, the State Court of Carroll County, Georgia entered an *Order and Final Judgment on the Plaintiff's Motion for Summary Judgment* (the "State Court Order") in favor of the Plaintiff and against the Debtor on the Indebtedness in *John W. Pucci, Sr. d/b/a Chestnut Run Excavating and Tree Service v. Chauncey Hill and Resurgence Demolition & Environmental, LLC*, Civil Action File No. 15-S-00324 (the "Carroll County Action"). *See* Complaint, ¶¶ 2 & 16 (and Exhibit "B" as attached thereto); *see also Defendant Chauncey Damon Hill's Answer to Plaintiff's Complaint Objecting to Discharge and Adversary Proceeding for Damages and Equitable Relief*, ¶¶ 2 & 16 (Adversary Docket No. 8)(the "Debtor's Answer").   The State Court Order referred to a *Consent Judgment* entered in the Carroll County Action in favor of the Plaintiff against Resurgence Demolition & Environmental, LLC ("Resurgence") dated October 18, 2016 (copy attached to the Complaint as Exhibit "A") that the Debtor executed on behalf of Resurgence as Member/Manager.   *See* Complaint, ¶ 12; Debtor's Answer, ¶ 12.   As of the Petition Date, the Indebtedness totaled $99,978.82 with interest accruing at a daily rate of $19.23.   *See* Complaint, ¶ 20; Debtor's Answer, ¶ 20.   The Debtor formed Resurgence on April 13, 2010 and served as its sole member.   *See* Complaint ¶ 33; Debtor's Answer ¶ 33.   The Debtor testified at the Evidentiary Hearing held in this Adversary Proceeding on June 14, 2021 that Resurgence is no longer an operating entity.   That testimony was uncontroverted.

[3]  In addition, although not asserted as a separate count, the Plaintiff asserts 11 U.S.C. § 523(a)(6) as a basis for nondischargeability in the Complaint.   (*See* Paragraphs 90, 91, and 94).

## PROCEDURAL BACKGROUND

The Court held a telephonic status conference in this Adversary Proceeding on March 10, 2021[4] to consider various matters in the Main Case and in this Adversary Proceeding.    The Court held another status conference on April 12, 2021, which was continued to April 19, 2021 (Docket, *passim*)(the "April 19 Conference"), to discuss the issues presented for decision in this Adversary Proceeding.    At the April 19 Conference, it was determined that an evidentiary hearing would be scheduled on Count I of the Complaint to decide the issue of the dischargeability of the Indebtedness.    *See Order and Notice Scheduling Evidentiary Hearing On Count I Of Plaintiff's Complaint*, entered on May 5, 2021 (Docket No. 28).    An in-person/virtual Evidentiary Hearing was held on June 14, 2021 (the "Evidentiary Hearing"), at the conclusion of which the Court announced the matter would be taken under advisement.    The Court's ruling on Count I is set forth herein.[5]

## FINDINGS OF FACT

Although no factual stipulation was offered at the Evidentiary Hearing, the parties agreed that the facts as presented in connection with Count I are mostly undisputed, with the contested issues centering on the Debtor's alleged fraud in obtaining services from the Plaintiff and the

---

[4]  *See Order and Notice of Telephonic Status Conference* entered on February 23, 2021 (Docket No. 16).    *Defendant Vetia Holland's Motion to Dismiss Plaintiff's Complaint as to Defendants Vetia Holland and Eagle Demolition & Environmental, Inc.* (Docket No. 20) and *Defendant Vetia Holland and Defendant Eagle Demolition & Environmental, Inc., Motion for Extension of Time to Respond to Plaintiff's First Interrogatories and First Request for Production of Documents* (Docket No. 18) were filed on March 2, 2021.    The Court has deferred consideration of these latter motions and the responses to them pending the entry of this Order resolving the dischargeability issue.

[5]  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.    This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I) as a determination of the dischargeability of a certain debt.    Venue is proper under 28 U.S.C. §§ 1408 and 1409.

Debtor's motivations at the time in failing to satisfy the Indebtedness owed to the Plaintiff. During the Evidentiary Hearing, the Court heard testimony from the Plaintiff (by videoconference) and from the Debtor (in person).[6]    The following facts are based on the evidence presented at the Evidentiary Hearing.

In 2011, Resurgence entered into an agreement with the United States Fish and Wildlife Service to remove telephone poles, pilings, and other debris at Little Beach Island in the E.B. Forsythe National Wildlife Refuge in New Jersey for the total contract price of $72,850.00 (the "Prime Contract").[7]    In October of 2011, the Debtor contacted the Plaintiff on behalf of Resurgence to see if Resurgence might engage Chestnut Run as a subcontractor to perform the work at Little Beach Island required by the Prime Contract.    The parties had no prior business dealings and negotiated over the telephone.    As reflected in a contract proposal from Resurgence to Chestnut Run dated October 24, 2011 (the "Contract"), and as testified to by the Plaintiff, Chestnut Run entered into an agreement to perform this work as a subcontractor (the "Project").

---

[6] The Plaintiff appeared by videoconference at his request.    The Debtor did not object to his appearing in this way. The Plaintiff's counsel appeared in person.

[7] *See* Plaintiff's Exhibit A (Request for Quotation dated September 15, 2011); Exhibit B (Proposal Addendum dated October 20, 2011); and Exhibit C (Notice to Proceed from U.S. Fish and Wildlife Service to Resurgence dated October 24, 2011).    This figure reflects the initial Resurgence proposal amount of $38,940.00 plus an increase of $33,910.00 to account for the additional pilings and poles that it was discovered needed to be removed after a site visit by the Plaintiff.    *See* note 8, *infra*.    Exhibits referenced herein were admitted into evidence as introduced by the Plaintiff at the Evidentiary Hearing.    Copies were also attached to *Plaintiff John W. Pucci's Exhibit List* filed at Docket No. 31.    The Debtor did not introduce any documentary evidence at the Evidentiary Hearing.

4

*See* Plaintiff's Exhibit D.    The Contract provided a Notice to Proceed, set forth the conditions and scope of the Project, and stated a contract price of $39,000.00.[8]

Chestnut Run began work on the Project in mid-October, 2011, and completed all work under the Contract by mid-November of 2011.    The Plaintiff believed the Debtor would pay him as agreed, so he incurred expenses using a barge and a marina in finishing the Project as well as incurring labor charges and dumping fees.    As stated in an invoice from Chestnut Run dated November 15, 2011, for $39,000.00, the Plaintiff understood that his performance of all services and work on the Project was satisfactory to the U.S. Fish and Wildlife Service.    *See* Exhibit E.[9] Since the Plaintiff believed he complied with his obligation to document completion as provided in the Contract (*see* page 7 of Contract), he presumed the Debtor would submit the appropriate documentation to the U.S. Fish and Wildlife Service and that payment from the Debtor to the Plaintiff would be made in due course.

When payment was not forthcoming and the net thirty (30) day invoice payment period was about to end, the Plaintiff contacted the Debtor regarding payment.    He was told by the Debtor that Resurgence did not have the funds to pay him and had not yet been paid for the Project. Payment to Chestnut Run was delayed, and although partial payments were discussed, they were postponed and ultimately never made.    In response to the Debtor's offer of an advance of

---

[8]  The Plaintiff testified that upon visiting the Project site, he discovered additional pilings and telephone poles needed to be removed as compared with the scope of work described in the initial proposal, and that this additional work is reflected in the Contract.    This visit by the Plaintiff resulted in the increase in the Prime Contract price described in note 7, *supra*.    The Debtor never visited the Project site.

[9]  The Debtor also testified that the Plaintiff performed the full scope of work as agreed in connection with the Project and that he never received any complaints regarding its quality or timeliness of completion.    The Plaintiff's work was also accepted by the Debtor on behalf of Resurgence.

$5,000.00 to $10,000.00,[10] the Plaintiff suggested a partial payment of $10,000.00 in an e-mail exchange dated December 23, 2011.   *See* Exhibit G.   The Plaintiff understood from the Debtor that he was expecting funds around the first of the year.   As reflected in a later e-mail exchange dated February 9, 2012, the Debtor proposed postponing the payment schedule to close by April 1st (*see* Exhibit I).[11]   The Plaintiff stated that by February 2012, he was becoming concerned, as there had been numerous conversations, the Debtor kept stating he did not have the money, and nothing had been paid.   Eventually, the Debtor stopped taking the Plaintiff's calls.   The Plaintiff's opinion that he would not be paid grew slowly over time after the Project had been completed due to the ongoing delay in receiving any payment from the Debtor.

On cross examination, the Debtor admitted that Resurgence was paid in full by the U.S. Fish and Wildlife Service for the work completed on the Project.   More specifically, the first payment was made via direct deposit into the bank account of Resurgence in the amount of $38,940.00 on December 6, 2011.   *See* Exhibit F-1 (p. 2 of 5)(the "First Deposit").   A second and final payment was made by the U.S. Fish and Wildlife Service to Resurgence in the amount of $33,910.00 on January 17, 2012.   *See* Exhibit F-2 (p. 2 of 6)(the "Second Deposit").   Thus, by January 17, 2012, Resurgence had been paid the full contract price of $72,850.00 by the U.S. Fish and Wildlife Service.

---

[10] On cross-examination, the Plaintiff acknowledged that the Debtor had initiated the payment proposal through his e-mail dated December 22, 2011.   *See* Exhibit G.

[11] The Plaintiff admitted he saw the Debtor's reference to using factoring sources to obtain the funds as shown on Exhibit I, but never received anything on his follow-up requests for more information.

Bank statements covering the time when the First Deposit and the Second Deposit were received by Resurgence indicate that the funds provided by each of these deposits were fully withdrawn within the month they were deposited. For example, the bank statement for November 29, 2011 through December 28, 2011 (Exhibit F-1) shows that this account had an opening negative balance of $286.58 and an ending negative balance of $5,023.74 (p. 1 of 5). Similarly, the bank statement for the period of December 29, 2011 through January 29, 2012 (Exhibit F-2) shows an opening negative balance of $5,023.74 and an ending balance of $2.42. The Debtor admitted that he was the person who withdrew most of the funds from the Resurgence bank account during this time.

The Debtor wrote numerous checks made payable to Cash during December of 2011 as shown on Exhibit F-3 (pp. 1 of 6 through 3 of 6).[12]   The Debtor testified that he used the proceeds obtained from these checks to pay expenses from past jobs, support current jobs, and keep the business running.[13]   When confronted with a check dated December 8, 2011 made payable to "Cash" in the amount of $9,000.00 and signed by the Debtor (Exhibit F-3, p. 1 of 6), the Debtor could not recall specifically how he used those funds.   He added, however, that during this period

---

[12] Checks made payable to Cash from December 6, 2011, through December 24, 2011, during the time of the First Deposit were as follows: $9,000.00; $6,600.00; $4,500.00; $4,400.00; and $5,000.00 for a total of $29,500.00.   *See* Exhibit F-3 (pp. 1 of 6 through 3 of 6).   The Debtor also made a series of ATM withdrawals during this period totaling around $1,800.00.

[13] Regarding a check for $7,000.00 payable to Clarence Brantley dated December 6, 2011 (Exhibit F, p. 89 of 104), the date of the First Deposit, the Debtor stated he had previously pawned his BMW, which was his only vehicle, to Mr. Brantley because he was short on cash.   The Debtor also testified that a debit card purchase to Global Imports for $1,038.30 dated December 19, 2011 (Exhibit F-1, p. 3 of 5) could have referred to auto repair for his BMW, and that this expense would have been related to the business since he used the vehicle for the business.   When this check is added to the Cash withdrawals mentioned above in note 12, the Debtor withdrew $38,163.25 in December of 2011.

he had other ongoing jobs and he was not receiving payment on several of them, especially from the City of Atlanta, that caused a series of escalating financial issues for the business.

Similarly, with respect to checks made payable to Cash written and cashed around the time of the Second Deposit,[14] when Resurgence had been paid in full on the Project, the Debtor again used those funds to pay vendors working on ongoing projects so he could continue operating and get paid by finishing jobs.    He was also trying to back-pay persons owed from previous jobs for work they had completed, including jobs for which he had not yet been paid.    Although he could not remember specific vendors that he paid with these funds given the substantial time that has passed,[15] the Debtor testified that he was paying for labor, equipment, materials, insurance, and fuel.

When Resurgence was not timely and fully paid by the City of Atlanta on the Auburn Avenue job,[16] Resurgence owed vendors, late fees, and finance charges.    Further, $60,000.00 "was tacked on" in additional cost and Resurgence lost money on the job.    On another City of Atlanta project, the James Orange Park demolition and grading job,[17] the Debtor testified that the

---

[14] Checks made payable to Cash around the time of the Second Deposit on January 17, 2012, were as follows: $4,800.00; $4,400.00; $3,800.00; and $4,300.00.    There was also an undated check payable to Cash in the amount of $5,000.00 included among the dated checks.    See Exhibit F-3 (pp. 4 of 6 through 5 of 6).

[15] The Debtor did recall paying James Potts, who was a subcontractor and associate.

[16] The Debtor stated that the City of Atlanta owed Resurgence $300,000.00 on an Auburn Avenue demolition job and he only received a partial payment of $122,000.00 thirteen (13) months late.    The Debtor could not remember the exact timing of the City of Atlanta project or the payment, but believed that work occurred on several projects with the City of Atlanta from approximately December 2010 through 2013.

[17] Resurgence also worked on the Stephens Street Warehouse in connection with that project, but only received payment for recycled scrap metal for approximately $20,000.00.    The bank records show copies of checks dated June of 2012 from Newell Recycling of Atlanta, Inc. totaling approximately $13,376.23.    See Exhibit F, pp. 71 of 104 through 80 of 104.    The Newell Recycling payments were a part of the deposit of $23,876.23 on June 28, 2012.    See Exhibit F, p. 71 of 104.

grant was not done properly and the City of Atlanta did not pay laborers and materialmen.[18]   As a result, Auto Owners Insurance Company pursued a claim against Resurgence of between $30,000.00 and $40,000.00 for what it paid based on a payment bond it had issued.   The bonding company placed a lien against the underlying project and against Resurgence[19] for its outstanding debt.   This action had a negative effect on the ability of Resurgence to obtain future work because it could not get another bond.

With respect to cash withdrawals during December of 2011 and January of 2012, the period of the First and Second Deposits, the Debtor was having trouble paying vendors and other expenses while fees and interest were accruing due to problems on the City of Atlanta jobs, the lien, and other issues.   When the City of Atlanta did not pay him, the Debtor owed seven or eight different vendors.   The Debtor lost the ability to rent equipment on credit[20] and was forced to pay cash during this period, as many vendors would no longer accept his checks.   These jobs and attendant problems all occurred around the time of the Contract with the Plaintiff, and the Debtor admitted that in October of 2011, he owed vendors, materialmen, and suppliers and said he "had more debt than I had money coming in."   The Debtor further testified, however, that when he entered the Contract, he expected he would be able to pay the Plaintiff, and nothing caused him to be concerned about his ability to do so at that time.

---

[18]  The connection between the failure of a grant proposal and the obligation of the City of Atlanta to pay was not explained, either on direct or cross examination.

[19]  The Debtor testified that a lien was placed against Resurgence, but it is not clear how that would occur outside of a lawsuit in this context.

[20]  For example, Resurgence typically paid $6,500.00 to rent an excavator.

Although the Debtor received payments on other jobs from April through June of 2012 as shown in the bank records (Exhibit F), he planned to use different funding sources to pay the Plaintiff.   The selection of these sources, to which he had referred in the February e-mail (Exhibit I), was based on his inquiries to a factoring company for an advance on the Auburn Avenue project, and those sources also included receipt of the amounts due from the City of Atlanta.[21]   Around that same time, not only was the Debtor dealing with issues caused by the bonding company but he had also been the victim of a theft.[22]   Some of these issues existed prior to the time of contracting with the Plaintiff[23] and some arose during that time.   Due to the theft and nonpayment issues with the City of Atlanta, along with the culmination of other problems, the Debtor was "trying to play catch up."[24]

As noted above, Resurgence did receive payments on other jobs during the Spring of 2012. For instance, Resurgence received a $26,232.00 payment from the St. Charles County (Missouri) Government on April 26, 2012, deposited on May 7, 2012, but after paying his subcontractors the

---

[21] These inquiries were unsuccessful.   The Debtor further stated that the Auburn Avenue project, a major project for the business, was his "biggest hope" to pay the Plaintiff, but did not use what he eventually received for that purpose.

[22] The Debtor testified that an individual, who represented he would obtain a bond for the Debtor, stole money from him around this time in connection with the payment received on another project with the City of Atlanta.

[23] The Debtor wrote checks payable to Cash in the total amount of $11,300.00 from September 7, 2011 through September 29, 2011.   *See* Exhibit F, pp. 83 of 104 through 85 of 104.   This demonstrates that the Debtor's withdrawals of Cash in December and January were not unusual, and were not directed at the Plaintiff or Resurgence's obligations to him.

[24] Similarly, when asked about a check made payable to Cash for $4,800.00 dated January 18, 2012 (Exhibit F-3, p. 4 of 6), one day after the Second Deposit, the Debtor reiterated that he was working other jobs, operating on a cash basis, and trying to keep the business afloat.   He repeated that he never received full payment on the Auburn Avenue job, received nothing on another City of Atlanta job except for $7,000.00, and as mentioned above, received payment on another City of Atlanta job that was stolen from him when subcontractors on the job were still owed money.

Debtor stated he only made about $600.00 to $700.00 profit.    Resurgence also received payment from Vivien Ellis for $10,000.00 (for dirt work), several payments from Javelin Capital LLC exceeding $26,000.00, and a series of payments from Newell Recycling of Atlanta, Inc. totaling $13,376.23 in the Spring and Summer of 2012 (Exhibit F, pp. 67 of 104 through 80 of 104).    From May, 2012 through July, 2012, Resurgence wrote checks payable to various subcontractors,[25] for repayment of a loan to Joe Neal for $800.00 dated May 15, 2012 (Exhibit F, p. 95 of 104), and for a permit on a job for St. Charles, Missouri payable to Callahan Company, Inc. for $2,000.00 dated June 29, 2012 (Exhibit F, p. 99 of 104).

At the time of the St. Charles payment, the Debtor was trying to keep the business operating and get fair payment (and late fees) from the City of Atlanta,[26] but eventually it became too much for him and he shut the business down.    Although he paid some subcontractors in 2012, the Debtor admittedly did not pay the Plaintiff and added there were quite a few other subcontractors or entities he was unable to pay.    In late Spring of 2012, the Debtor borrowed money from between seven to eight different people, and family members lent him money.    The Debtor was

---

[25] These checks included as follows: $9,000.00 to James Potts, Jr., subcontractor, dated May 18, 2012 (Exhibit F, p. 95 of 104); $570.00 to Terrence Parks, subcontractor, dated June 15, 2012 (p. 96 of 104); $810.00 to Michael Gray, subcontractor, dated June 15, 2012 (p. 96 of 104); $3,070.00 to Grind Trucking, dated June 28, 2012 (p. 99 of 104); $1,540.00 to Haul Masters, Inc., dated June 28, 2012 (p. 99 of 104); and $9,000.00 to Shalona Phillips, subcontractor, July 11, 2012 (p. 99 of 104).    He also wrote checks to Byron Henry and Nicholas Ellis.    Debtor also explained that a check payable to Tiaquina Potts for $6,000.00 dated May 18, 2012 (Exhibit F, p. 96 of 104) was for subcontractor work as a truck driver.    He allowed that he still owes Potts money.    In addition, Resurgence wrote a check for $5,000.00 to Nishota Consulting Services dated December 21, 2011, for asbestos abatement (Exhibit F, p. 91 of 104). The Debtor also cashed checks that he signed written to Cash in the total amount of $32,200.00 from May to mid-July of 2012 (Exhibit F, pp. 95 of 104 through 100 of 104).

[26] Although the City of Atlanta did make a partial payment on the Auburn Avenue job according to the Debtor, he testified that he used those funds to cover his expenses but still did not have enough and did not make any profit on that job.    This payment does not appear to have been received during the period covered by the bank records admitted into evidence.    In addition, as noted above, the Debtor testified that he could not remember exactly when the payment was received.

looking for monies to come in from jobs so that he could pay the Plaintiff and continue to make money on other jobs.   He testified that he had every intention to pay the Plaintiff and did not single him out or try to deprive him of payment.   The Debtor just could not afford to pay all the people he owed though he insisted he tried his best.   But for all the issues he encountered, the Debtor asserted he could have paid everyone, and Resurgence would still be operating.

The Debtor did not use any of the funds received on checks payable to Cash for his personal benefit.   Instead, he testified they were used to keep the business operating.   He did admit that he used some of the Contract funds for modest personal expenses, as shown by checks made payable to himself,[27] but most of the checks written on the Resurgence account were used for business expenses.

Despite the Plaintiff's requests for payment based on the completion of the work, to date, neither Resurgence nor the Debtor have paid the Plaintiff any amount as due under the Contract.

## **DISCUSSION**

The Plaintiff contends that the Indebtedness should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).   Based on the presumption under Section 727(b) that all debts are dischargeable, a party contending to the contrary must prove nondischargeability.   The burden of proof is on the creditor to establish an exception to discharge by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287-88, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).   Further,

---

[27] The Debtor acknowledged writing seventeen personal checks over a ten-month period for a total of $10,005.00, seven of which bounced.   He explained that checks he had received bounced because other entities that owed him money stopped payment based on disputes arising over a particular job, and still other payments owed to Resurgence were delayed.   The Debtor affirmed that he did not have a personal bank account and used this account for business reasons and justified his occasional personal use because he "was the business."

such exceptions should be narrowly construed against the creditor and in favor of the debtor. *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301 (11th Cir. 1994); *St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672, 680 (11th Cir. 1993).    Section 523(a) of the Bankruptcy Code provides that "a discharge under section 727…does not discharge an individual debtor from any debt… (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."    11 U.S.C. § 523(a)(2)(A). A debt is excepted from discharge under this provision when it occurs "in relation to the commission of 'positive or actual fraud involving moral turpitude or intentional wrongdoing.'" *Invest Atlanta Regional Center, LLC v. Smith (In re Smith)*, 578 B.R. 866, 875 (Bankr. N.D. Ga. 2017)(citations omitted).    Moreover, "'legal or constructive fraud, which involves an act contrary to a legal or equitable duty that has a tendency to deceive, yet not originating in an actual deceitful design, is insufficient.'"    *Ibid* at 876 (citations omitted).

To succeed on a claim under Section 523(a)(2)(A), a creditor must show that the debtor "'obtained money, property or credit from the Plaintiff: (1) by false representation, pretense, or fraud; (2) knowingly made or committed; (3) with the intent to deceive or to induce acting on same; (4) upon which the Plaintiff actually and justifiably relied; and (5) from which the Plaintiff suffered damages, injury or loss as a proximate result.'"    *Ibid* at 876 (citations omitted).    Proof of false representation under Section 523(a)(2)(A) requires "more than an alleged representation by a debtor of an intent to perform a certain action in the future.    *Smith*, *supra*, 578 B.R. at 876, citing *Wells Fargo Bank, N.A. v. Farmery (In re Farmery)*, 2014 WL 2986630, *2 (Bankr. N.D. Ga. Apr. 11, 2014)(other citations omitted).    Rather, it must be shown that "at the time when the

13

Debtor entered" the agreement at issue, here the Contract, the Debtor "either knew that [he] lacked the ability" to pay the Plaintiff "or that [he] had no intent" to pay him. *See Smith*, *supra*, 578 B.R. at 876, citing *Bropson v. Thomas (In re Thomas)*, 217 B.R. 650, 653 (Bankr. M.D. Fla. 1998); *American Surety & Cas. Co. v. Hutchinson (In re Hutchinson)*, 193 B.R. 61, 65 (Bankr. M.D. Fla. 1996). In addition, "an inability to pay in and of itself does not support an inference that the Debtor never intended" to perform. *Smith, supra*, 578 B.R. at 877, citing *Farmery*, *supra*, at *2.[28]

Moreover, as a debtor is unlikely to admit that "she made a promise without the intent to perform or that she made a false statement or omission with the intent to deceive the creditor, the court is permitted to infer such fraudulent intent from the facts and circumstances of the case." *In re Bucciarelli*, 429 B.R. 372, 375–76 (Bankr. N.D. Ga. 2010)(Drake, J.); *see also In re Bullock*, 317 B.R. 885, 890 (Bankr. N.D. Ala. 2004); *In re Hall,* 228 B.R. 483 (Bankr. M.D. Ga.1998). The "determination of the debtor's fraudulent intent to deceive depends in large measure upon the assessment of the debtor's credibility made by the Court and the demeanor of the particular debtor." *Bullock, supra*, 317 B.R. at 890 n.1 (citations omitted). *See also In re Juravin*, 623 B.R.

---

[28]  A creditor does not establish the necessary intent solely by the fact that an insolvent debtor incurred debt he did not have the ability to pay.   Rather, it is the debtor's knowledge that he cannot pay that matters in terms of establishing that he possessed the required intent not to repay the debt.   *FDS Nat'l Bank v. Alam (In re Alam)*, 314 B.R. 834, 840 (Bankr. N.D. Ga. 2004).

343, 346 (Bankr. M.D. Fla. 2020), *judgment entered,* 2020 WL 6802383 (Bankr. M.D. Fla. Oct. 27, 2020)(citations omitted).[29]

The Plaintiff argues that the Debtor obtained services from the Plaintiff under false pretenses because the Debtor made a promise to pay with no present intent to perform when the parties entered the Contract.    Alternatively, the Plaintiff asserts that the Debtor knew he had an inability to pay at that time coupled with the additional element that he created the scenario that caused this inability by choosing to pay himself.[30]    According to the Plaintiff, the Debtor's recollection that he paid a series of business expenses with funds withdrawn for cash from the Resurgence bank account is not credible because he could not identify which vendors he paid during the December 2011 through January 2012 time period.[31]    The Plaintiff referred to three (3) separate occasions when the Debtor received significant funds but chose not to pay the Plaintiff. The Plaintiff mentioned the receipt of $72,850.00 from the U.S. Fish and Wildlife Service, the

---

[29]  *See also Rosen v. Protective Life Ins. Co.*, 817 F.Supp.2d 1357, 1375 (N.D. Ga. 2011), *aff'd sub nom. Rosen v. Am. Guarantee & Liab. Ins. Co.*, 503 F. App'x 768 (11th Cir. 2013)("'Fraudulent intent at the time of contracting can be inferred based on subsequent conduct of the defendant that is unusual, suspicious, or inconsistent with what would be expected from a contracting party who had been acting in good faith'" (quotations and citations omitted)), quoted in *K.A.P., Inc. v. Hardigan*, 560 B.R. 895, 900 (S.D. Ga. 2016).   "'Nevertheless, the subsequent failure of the debtor to pay, without more, is not sufficient to establish that the debtor lacked the intent to pay when the representation was made.'"   *Ibid*, quoting *Bullock, supra*, 317 B.R. at 890.

[30]  The Plaintiff asserts that the required "plus" factor to succeed on the grounds of the Debtor's knowing inability to pay (*see* note 28 and accompanying text), is satisfied by evidence of the Debtor's own efforts to render payment to the Plaintiff impossible.

[31]  The Plaintiff also notes the lack of corporate records to substantiate the Debtor's testimony.   This lack of documentary evidence was not explained by either party and, like the Debtor's inability to identify vendors that he paid, is not surprising given the substantial time (nearly a decade) that has elapsed since the events in question.   The lack of records is also not surprising because Resurgence itself has been out of business for years.

15

receipt of funds in May and June of 2012 for $23,000.00 and $26,000.00,[32] respectively, and the

receipt of a partial payment from the City of Atlanta for over $120,000.00.[33]    The Plaintiff argues

that every time the Debtor had the ability to pay, he never actually did so.    Instead, he decided

not to pay the Plaintiff, using Resurgence's funds for other purposes.    As such, the Plaintiff argues

he has shown either an intent by the Debtor not to pay at the time of contracting, or an inability to

pay the Plaintiff that the Debtor himself orchestrated through the series of cash withdrawals for

which he could not properly account and which went to pay himself.

The Debtor counters that, despite the allegations in the Complaint, the Plaintiff offered no

evidence of the Debtor's actions or statements contemporaneous with the formation of the Contract

tending to show a present intent of the Debtor not to make payment at that time.    (*See* Complaint,

¶ 53).    In addition, choosing to pay one creditor over another does not establish that the Debtor

had a fraudulent intent.    The Debtor explained how he bid jobs and worked on credit until that

avenue was closed to him following the concurrence of the financial setbacks he described.    At

that point, he could no longer float amounts due for equipment rental or pay subcontractors on

terms or until the end of a project when he got paid.    Instead, he was forced to pay primarily in

cash.    According to the Debtor, the payments reflected on Exhibit F demonstrate his efforts to

---

[32] Resurgence deposited the amount of $23,876.23 into its account on June 28, 2012, comprised of checks from Newell Recycling totaling $13,376.23 and a check from Javelin Capital for $10,500.00.    Exhibit F, pp. 71 of 104 through 80 of 104.    Resurgence also deposited a check from St. Charles County Government for $26,232.00 on May 7, 2012.    Exhibit F, pp. 66 of 104 through 67 of 104.    In addition, Resurgence deposited three (3) other checks from Javelin Capital totaling $15,650.00 during May and June of 2012 (Exhibit F, pp. 67 of 104 through 70 of 104), and as noted, a check from Vivien Ellis for $10,000.00 on June 12, 2012.    Exhibit F, pp. 68 of 104 through 69 of 104.

[33] The parties agree that there is no record of a deposit of this payment from the City of Atlanta in the documents shown on Exhibit F, though the Debtor admitted receiving it at some unidentified point in time.    *See* notes 16 and 26, *supra*.

keep the business operating and pay creditors what he could.    The Debtor maintains he made a

good faith attempt to pay his creditors but, unfortunately, he could not pay them all, and the failure

to pay the Plaintiff does not rise to the level of fraud required under Section 523(a)(2)(A).

As stated above, because a debtor typically will not admit fraudulent intent, the Court must

consider the totality of the circumstances and evaluate the credibility of the Debtor's testimony.

On first analysis, the timeline in this case is not favorable to the Debtor.    The evidence shows that

Resurgence received the First and Second Deposits within a two (2) month period following the

Plaintiff's completion of the Project, and that the Debtor spent each installment without remitting

a single dollar to the Plaintiff.    In December of 2011 and January of 2012, the Debtor wrote a

series of checks payable to Cash, some in multi-thousand-dollar amounts, and made certain ATM

withdrawals effectively depleting the account each month.    The evidence also shows that

Resurgence received several checks in significant amounts that were deposited in the Spring of

2012 and still made no payment to the Plaintiff.

On closer review, however, the Debtor testified that he used these funds to pay ongoing

business expenses and to support business operations when forced to proceed on a cash basis

around the time of the Project and during the months thereafter.    The Court observed the Debtor's

demeanor and finds his testimony, which was unrebutted, to be reasonably credible.    His

testimony is the only evidence explaining how he spent these cash withdrawals,[34] and based on

---

[34]  The Plaintiff presented no evidence that the Debtor did not use the cash withdrawn for the business expenses, as he testified.   No evidence was presented that the funds were used by the Debtor for his personal use, although some amount of such use might have been expected and permitted.    This was the Debtor's only business, and the amounts withdrawn by check would not have provided adequate funding to allow him to pay even modest living expenses.

the evidence it is just as likely he used the funds for business expenses as it is that he diverted them for personal use instead of paying the Plaintiff.[35]

Although the Plaintiff maintains the Debtor's testimony is contradicted by the Debtor's mode of operation, implying he made undesignated cash withdrawals for personal expenses, the burden is not on the Debtor to prove what he did with those funds.    The Debtor did write several checks payable to himself that he admitted were for personal expenses.    The fact that he did not just make cash withdrawals for such purposes suggests the Debtor made a distinction during the relevant period between funds due to him and those that belonged to the business.

The documentary evidence shows, and the Debtor did not dispute, that Resurgence received a number of large deposits during the time of the Contract in the Fall of 2011 through the Summer of 2012.    The Debtor also testified, however, about a series of problems ranging from the late and partial payment on the City of Atlanta Auburn Avenue job (a major project) to lien issues with the bonding company to an alleged theft of proceeds, that severely affected the cash flow of Resurgence and negatively affected its ability to do business during this period.    Along with nonpayment of other amounts owed Resurgence, this confluence of factors appears to have disrupted its capacity to pay all its vendors in full on a timely basis.    As Resurgence failed to meet all its financial obligations, vendors began to cut off access to credit and refused to accept its checks.    Once its credit sources were terminated, however, the urgent need for cash hindered its

---

[35] Although the Debtor could not remember or specifically identify very many of the vendors he paid from the checks made payable to Cash, those payments occurred nearly ten (10) years ago.    Conversely, the Plaintiff testified that he had no firsthand knowledge how the Debtor used the funds he received through cash withdrawals from August 2011 to July 2012 (see Plaintiff's Exhibit F) and indicated he would have to rely on his attorney's review of the relevant documents.    Nothing regarding any such review was presented to the Court.

ability to begin new projects.    Meanwhile, late fees and interest charges continued to accrue on existing accounts, further contributing to a downward cycle that never improved as Resurgence' obligations exceeded its available resources.    This eventually led to the demise of the business, but not until well after the Contract was performed and the related obligations might have been satisfied.

**<u>CONCLUSION</u>**

The Plaintiff bears the burden of proof herein under 11 U.S.C. § 523(a)(2)(A).    In this case, the Plaintiff has failed to prove by a preponderance of the evidence that the Debtor did not intend to pay the Plaintiff at the time the parties entered into the Contract.    Resurgence received the proceeds on the Project, along with other payments during the months following its completion. It also paid some of its subcontractors and vendors but never paid the Plaintiff what was owed under the Contract for the work Chestnut Run performed as agreed.    Based on the Debtor's unrebutted testimony regarding use of the cash withdrawals and related matters, however, it appears he was likely under pressure to pay the persons and entities he might need to keep the business going and continue working on demolition jobs so he could generate revenue as Resurgence' economic condition steadily worsened over time through a series of financial setbacks.[36]

Further, the Plaintiff has not shown that the Debtor knew he did not have the ability to pay the Plaintiff at the time of contracting.    Based on the expected payment on the Project from the

---

[36]  Further, as early as December of 2011, the Debtor proposed making a partial payment of $5,000.00 to $10,000.00 as an advance.    *See* Exhibit G.

U.S. Fish and Wildlife Service alone, which was twice the amount needed to pay the Plaintiff, the Debtor had the ability to pay the Plaintiff for services performed under the Contract at the time the Contract was made.

In view of the foregoing, it is

**ORDERED** that judgment be granted for the Debtor on Count I of the Complaint, such that the Plaintiff's claim for relief under Count I of the Complaint is **denied** and the Indebtedness is **not excepted** from discharge under 11 U.S.C. §§ 523(a)(2)(A) or 523(a)(6) [37] and is **dischargeable**.

The Clerk is directed to serve a copy of this Order upon the Debtor, counsel for the Debtor, counsel for the Plaintiff, the Chapter 7 Trustee, and the U.S. Trustee.

**[END OF DOCUMENT]**

---

[37] The Plaintiff presented no evidence or argument regarding the claim that the Indebtedness is excepted from discharge under 11 U.S.C. § 523(a)(6), and thus judgment will also be entered for the Debtor on the Plaintiff's assertion that the Indebtedness should not be discharged under 11 U.S.C. § 523(a)(6), and any related request for relief on that basis is also **DENIED**.

20